WINDHORST, J.
_JjThe Juvenile Court for the Parish of Jefferson rendered judgment in this case on the petition filed by the State of Louisiana, Department of Children and Family Services (“DCFS”), terminating the parental rights of the mother, T. and the father, *292 W.D., to the minor child, T.D.[1] Both T. and W.D. appeal from that judgment. For the following reasons, we affirm the decision of the juvenile court.
Procedukal History and Facts
T.D. was born on February 4, 2002, and was 14 at the time of the termination hearing. T.D.’s aunt, D.M., was his legal guardian and primary caregiver for most of his life.
On January 30, 2015, the Jefferson Parish District Attorney’s Office (D.A.’s Office) filed a petition against T.D. alleging that he committed simple battery, simple robbery and criminal damage to property. On February 19, 2015, a petition was filed charging T.D. with theft of goods valued under $500.00. On March 4, 2015, the matter came for adjudication. The State dismissed the charges of simple battery and simple criminal damage to property and T.D. entered an admission to the charge of simple robbery. On March 5, 2015, T.D. entered into an Informal Adjustment Agreement with the D.A.’s Office and was enrolled in the diversion program.
On March 17, 2015, the D.A.’s Office filed a petition against T.D. alleging that he committed theft of goods and criminal trespass. On March 31, 2015, T.D.’s bond was revoked on the simple robbery charge, and he was remanded to the Rivarde Detention Center.
Thereafter, the March 17, 2015 petition was amended to charge a Family in Need of Services (“FINS”): ungovernable. T.D, entered an admission to the FINS 12charge. At this time, he was placed in the custody of DCFS. On the allegation of simple robbery, T.D. was sentenced to the Office of Juvenile Justice for one year, suspended, and placed on two years active probation. The DCFS held several review hearings in 2015 and 2016, during which time it was noted that, although there was a visitation schedule set, T.D.’s parents failed to visit him. In May of 2016, T.D. was hospitalized three times for voicing suicidal ideations. Three hearings were held regarding this issue. There was no indication that the parents visited T.D. during this time.
On May 16, 2016, DCFS filed a petition for termination of parental rights, alleging that T.D. had been abandoned by his parents. Also on'that date, the juvenile court ordered appointment of attorneys for W.D. and T. At the July 16, 2016 case review hearing, it was noted that his parents still had not visited T.D., and further had not visited him since he had been taken into DCFS custody.
In the petition for termination of parental rights, it alleged that T.D. had been placed in the State’s custody on April 14, 2015, and had remained in the State’s custody since that time, for a period of over one year. DCFS further alleged that both T. and W.D. abandoned T.D. by leaving him under circumstances demonstrating an intention to permanently avoid responsibility by failing to provide significant contributions to T.D.’s care and support and/or by failing to maintain significant contact with T.D. for a period of six consecutive months from the time T.D. entered into the State’s custody through the date of filing of the petition, citing La. Ch.C. art. 1015, Sections 5 and/or 6.[2]
*293 The hearing on the petition filed by DCFS was held on August 15, 2016. At the hearing, the Juvenile Court judge took judicial notice of the underlying FINS record. Jovia Alexis, employee of the DCFS and the foster care worker for T.D., 1,.¡testified that the FINS proceeding “turned into” a CINC proceedings, and T.D. entered foster care in April of 2015, after T. tested positive on a. drug screening. Ms. Alexis stated that a case plan was formulated for T. which included parental contributions or child support payments and visitation. T. did not make any contributions or child support payments, and did not provide food, clothing or other necessities for T.D. In addition, T. did not make any visits. While T. did not initiate contact with DCFS, she did answer when Ms. Alexis contacted her. Ms. Alexis stated that T. indicated that she understood her case plan, but she indicated an unwillingness to participate in that plan. According to Ms. Alexis, T. stated that “she did not complete or will not participate in her case plan and she would not be completing as she felt that [T.D.] being in state custody was best for [him].” Ms. Alexis also testified that initially, DCFS provided bus tokens to enable T. to visit the child, but stopped when it was learned that T. had an automobile and/or was not visiting T.D. Ms. Alexis conducted a home visit and determined that T. did not maintain housing that would be safe and appropriate for T.D. Ms. Alexis stated that, to the best of her knowledge, T. did not maintain a legal means to support herself and T.D. and that she did not have a job or provide proof of income. T. did participate in a psychiatric evaluation, and the recommendations were that she complete a substance abuse program, and then, after she was clean and sober, participate in parenting classes. T. did not complete a substance abuse program, and therefore was not referred for parenting classes. Finally, Ms. Alexis stated that T. had not made any substantial improvement in addressing the problems that prevented her unification with T.D., the minor child.
T. testified that she wanted an opportunity to be reunited with T.D., but that she could not comply with all requirements of her reunification plan because she was “dealing” with her other children, including a bipolar son.
LGoncerning W.D., Ms. Aexis testified that there was also a case plan formulated for him, which included support and visitation. W.D. did not make any parental contributions or pay any child support. Furthermore, W.D. failed to visit T.D. and failed to maintain contact with DCFS. Ms. Alexis stated that she could not determine whether W.D. had maintained safe and appropriate housing for himself and T.D. because she was unsuccessful in her attempts to schedule an appointment with W.D. to visit his home. Furthermore, W.D. had not informed her that he was employed, and had not provided proof of income to DCFS. Ms. Alexis stated that the conditions that led to T.D.’s removal from W.D. persisted and that W.D. had not kept in contact with T.D., nor had he complied with a program of treatment and rehabilitation services set forth in his case plan. Ms. Alexis testified that a case plan had been formulated and she made an appointment with W.D. to review the plan. W.D. did not show up for the appointment and he did not reschedule.
*294 At the time of the hearing, W.D. was incarcerated, awaiting trial on a possession of heroin charge. W.D. stated, that he was incarcerated in April of 2016. W.D. testified that he was unaware of any case plan made by the DCFS. W.D. further testified that he had .two houses, and family members that were willing to take care of T.D. while he .was incarcerated, but he also admitted that he did not provide the names of those persons to DCFS. He also stated that he was willing to take custody of T.D., but did not attempt to do so because “That was between.him and his mother to come in here.” W.D. also stated that he could have paid bond money and been released pending trial, but refused to do so because he was facing contempt charges for non-payment of child support.
Finally, Ms. Alexis testified that T.D. was currently in the custody of DCFS, residing at BoysTown in New Orleans, and that he was adjusting well with a few minor setbacks. According'to Ms. Alexis, T.D. had related to her that he wished to Ifibe adopted. Furthermore, DCFS was of the opinion that it is in the best interest of T.D. that he be freed for adoption and that, if freed for adoption, adoptive resources would be recruited.
Malik Regard testified that it was the recommendation'of T.D.’s Court Appointed Special Advocate (“CASA”), that he remain in his current placement and continue the services that were being provided.
Analysis
The Louisiana Supreme Court has stated that:
In any case to involuntarily terminate parental rights, there’ are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and. management of their children warranting great deference and vigilant protection under the law and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have eonsis-tently found the interest of the child to be paramount over that of the parent.
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the. State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious.judicial process for the termination - of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents *295 and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. (Citations omitted).
In re J.A., 99-2905 (La. 01/12/00), 752 So.2d 806, 810-811.
RLa. Ch.C. art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. Petitioner in an involuntary termination' of parental rights proceeding need establish only one ground for termination of parental rights. State ex rel. ML, 95-0045 (La. 09/05/95), 660 So.2d 830; State ex rel. A.T.C., 06-562 (La.App. 5 Cir. 11/28/06), 947 So.2d 71. The Juvenile Court judge must also find that the termination is in the best interest of the child. La. Ch.C. art. 1039; State in Interest of ML & PL, 95-0045 (La. 09/05/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds in Ch.C. art. 1015 by clear and convincing evidence. State ex rel. ML, supra. The appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. In re D.L.R., 2008-1541 (La. 12/12/08), 998 So.2d 681, 687: State ex rel. K.G., 02-2886 (La. 03/18/03), 841 So.2d 759, 762.
In this case, DCFS sought termination of T.’s parental rights and W.D.’s parental rights under La. Ch.C. art. 1015(5) and/or (6), which provides:
The grounds for termination of parental rights are:
* * *
(5) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child’s parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for-the safe return of the child; and despite earlier intervention, there is no reasonable | expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The Juvenile Court judge in this matter gave extensive reasons in rendering judgment. Concerning termination of the parental rights of T.D.’s mother, T., the court found that:
At the adjudication hearing on April 14, 2016, T.D.’s mother consented to T.D. being placed in the custody of DCFS. Thereafter, T.D. was placed in Boys-Town. Since that date, seventeen months ago,.T- has never been to BoysTown to .visit her s.on.... On multiple occasions, T. has expressed that she would. not and/or could not care for her son.... *296 For the seventeen months that T.D. has been in the custody of DCFS, T. admittedly failed to contribute any monetary child support, clothes, food or other necessities for her son. At every hearing and in every DCFS report to the court, it was noted that T. never once contributed to the cost of caring for her son. T. has failed to provide any financial support for her son and has failed to maintain significant contact with her son over a seventeen month period. Therefore this court finds that the state has met its burden by clear and convincing evidence in accordance with Article 1035, that T.’s parental rights may be terminated pursuant to article 1015 (4) [now (5) ].
With regard to termination of the parental rights of T.D.’s father, W.D., the court found that:
According to DCFS reports and testimony in court, W.D. made his first contact with DCFS on October 1, 2015, after T.D. called W.D.’s flaneé to make them aware that he was in state’s custody. W.D. told the caseworker he was moving to Waggaman and that he would be preparing a room for T.D. W.D. did not reach out to DCFS again until February 11, 2016 when he spoke with Ms. Alexis. Ms. Alexis testified that W.D. requested a meeting so that they could go over his case plan. He also asked Ms. Alexis if she would bring T.D. to the meeting so that they could have a visit. Ms. Alexis and W.D. agreed that W.D. would come to the DCFS office on February 15, 2016 and that she would bring T.D. for a visit. W.D. failed to show up for the hearing. He also failed to contact DCFS to set up another appointment. According to all reports and testimony throughout the history of this case, W.D. has failed to visit his son and has failed to contribute to the cost of his care. Pitifully, he did not know his son was in DCFS care until the child himself called to tell him. Ms. Alexis did testify that T.D. and his father talk on the phone occasionally, but only because T.D. initiates the phone calls. It should be noted that W.D. is currently incarcerated and is therefore unable to adequately care for T.D.
8It should also be noted that on August 2, 2002, a Motion for Child Support was filed by the District Attorney in Jefferson Parish Juvenile Court, against W.D., for the support of T.D. under docket number 2002 NS 899. On August 5, 2002, W.D. entered into a Consent Judgment in which he agreed to pay T. $188 per month for the care of T.D. On December 14, 2014, T. waived all arrears due to her. At that time, W.D. owed $26,578.37 in child support arrears. After that, W.D. still failed to pay his monthly obligation.
Since the inception of the case in 2002, W.D. has paid a total of $1031.37 for the support of T.D. ... From April 2014 through March 2016, W.D. paid not one cent of child support. From May of 2006 through March of 2014, he paid a total of $69.63. W.D. has clearly failed to [financially] support T.D. for the entirety of his life. Therefore because W.D. has both failed to maintain significant contact and failed to provide significant contributions to T.D.’s care and support for periods well beyond six months, this court finds that the state has met its burden by clear and convincing evidence in accordance with Article 1035, that W.D.’s parental rights may be terminated pursuant to article 1015 (4) [now (5) ]. (Emphasis in original.)
Our review of the record reflects that the Juvenile Court was not manifestly erroneous in its conclusions that the State met its burden of proving, by clear and convincing evidence, that both T. and W.D. failed to maintain significant contact with and failed to provide significant contributions for the care and support of their son, T.D. In fact, T. admitted that she had not seen her son and had not paid any sums of *297 money for his care. Likewise, W.D. also admitted that he had not seen his son or made significant contributions toward his care. W.D. testified that he was incarcerated, awaiting trial, and that he could “bond out,” but that if he did, there was a detain-er in Juvenile Court for failure to pay child support. We find no error in the Juvenile Court’s judgment terminating the parental rights of both T. and W.D.
In brief to this Court, T.D.’s father, W.D., argues that the Juvenile Court erred in terminating his parental rights based on abandonment because this matter started as a Family in Need of Services, and that it was never properly transitioned to a Child in Need of Care case. Therefore, argues W.D., proper notice procedures were not followed.
RT.D.’s mother, T., argues that the Juvenile Court erred in allowing DCFS to pursue termination proceedings based on allegations stemming from the FINS proceeding, as the laws are not set forth to ensure that the parent’s rights are afforded protection in such cases. T. further alleges that she was not advised of her statutorily required warning and rights at the numerous hearings held after the child entered into the custody of DCFS, and further she was not warned that her parental rights could be terminated.
La. Ch.C. art. 1001, et seq. provides for the termination of parental rights. La. Ch.C. art. 1001 provides:
The purpose of this Title is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child’s adoption. This Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for children.
According to La. Ch.C. art. 1004,[3] in a CINC proceeding, the DCFS, the District Attorney, counsel appointed for the child in a Child in Need of Care (CINC) proceeding, or the court itself may file a petition for termination of parental rights. La. *298 Ch.C. art. 1004 does not restrict all petitioners to a CINC Improceeding. In this case, after the filing of the petition for termination of parental rights, counsel was appointed for both parents, and both parents were present and represented at the termination hearing. Furthermore, La. Ch.C. art. 1004 provides that DCFS may petition for termination of parental rights when the child “has . been abandoned and termination is authorized by Article 1015(4).” The statute does not require that the DCFS first file to have the child adjudicated in need of care prior to the filing of the petition for termination. We note that the provisions for filing for termination of parental rights are not located in that part of the Children’s Code that provides for either FINS adjudications (Title VII), or for CINC cases, (Title VI), but are located in totally separate section-of the Children’s Code (Title X). “The Legislature has expressed its intent that courts shall construe the procedural provisions of Title X of the Children’s Code relative to the involuntary termination of parental rights liberally.” State ex rel. C.J.K., 00-2375 (La. 11/28/00), 774 So.2d 107, 114. There is nothing to support either parent’s claim that this termination of parental rights petition is somehow ineffective or flawed, because the child was taken into the custody of DCFS during a FINS case, and not a CINC case.
In this case, given that the evidence showed clearly and convincingly that both parents abandoned the child by failing to maintain significant contact after the child was placed in custody, and by failing, to provide significant support at any time, the DCFS could have independently filed its petition for termination of parental rights. Attorneys were appointed for each parent at that time, and each parent was present and testified at th'e termination hearing. Accordingly, the procedural safeguards for termination of parental rights were met,
T.D.’s mother, in brief contends that DCFS used the child’s “delinquent and ungovernable status as a basis to terihi-nate parental rights.” However, her parental: rights were terminated for abandonment, and not the child’s delinquent status.
|uIn addition, both T. and W.D. also argue that the Juvenile Court erred in finding that termination of parental rights was in- the best interest of the child because T.D. was not positioned for adoption at the time of the hearing. However, a review of La. Ch.C. art 1001, supra, reflects that there is no requirement that mandates that the plan for adoption be set prior to the termination of parental rights.
In its original enactment, La. Ch.C. art. 1001 had provided that “(pie purpose of this Title is to provide a-judicial process for the termination of all parental rights and responsibilities under' circumstances described herein. Such termination of parental rights is to be considered the first step toward permanent placement of the child in a suitable home through the process of adoption.” La. Ch.C. art, 1001 was amended in 1997.[4] According to the Official Revision Comments in the 1997 amendment, La. Ch.C. art. 1001 was amended, first “to emphasize that the best interest of the child must be the foremost concern of the court when demonstrated justification exists to sever the parents’ rights,” and that:
*299 Three additions have been made to this Article by the 1997 amendments. The first is to emphasize that the best interest of the child must be the foremost concern of the court when demonstrated justification exists to sever the parents’ rights. If termination of parental rights is not warranted, under Article 1039, the court has other options that may better serve the child’s best interest. The second addition is to recognize that although adoption is the goal when termination of parental rights is ordered, adoptive placement may prove to be impossible to secure for some children. In those cases, a permanent placement of the child, as defined by Art; 1003(8) can become an acceptable alternative. The third addition is to emphasize that time is of the essence in processing a termination. of parental rights case, limited only by assuring that the fundamental due process fights of the parents are safeguarded. An expeditious 112resolution of the child’s status is imperative if stability for the child is to be achieved. (Citations omitted).
See 1997 La. ACT 256.[5]
These Comments recognize that there are some situations in which the best interest of the child still is served by termination of parental rights, even if adoption might not be possible.
In this case, having found that the Juvenile Court did not commit manifest error in finding that the best- interests of the child were served by terminating parental rights, we find no merit to the arguments of T, and W.D. that the Juvenile Court erred in terminating their parental rights in this proceeding that began as a FINS case, or because the child was not. positioned for adoption. at the time of the termination hearing.
CONCLUSION
For the above discussed reasons, the ruling of the Juvenile Court terminating the parental rights of the mother, T., and the Father, W.D., is affirmed.
AFFIRMED

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules-Courts of Appeal, the initials of the minor and family members involved will be used to protect the child’s identity. State Dept. of Soc. Services, ex rel. S.S., 07-165 (La.App. 5 Cir. 9/25/07), 968 So.2d 199, 200. The .minor child has the same initials as the mother and therefore the child will be referred to as T.D. and the mother will be referred to as T.

. The petition filed by DCFS refers to La. Ch.C. art. 1015, sections 4 and 5. However, *293 La. Ch.C. art. 1015 was amended and sections 4 and 5 were redesignated as sections 5 and 6 respectively. 2016 La. ACT 608. Facts pleaded in petition clearly indicate that DCFS was proceeding under La. Ch.C. art. 1015, sections 5 and 6. For clarity, the current section number will be used throughout this appeal.

. La. Ch.C. Art. 1004 provides:
A. At any time, including in any hearing in a child in need of care proceeding, the court on its own motion may order the filing of a petition on any ground authorized by Article 1015.
B. Counsel appointed for the child pursuant to Article 607 may petition for the termination of parental rights of the parent of the child if the petition alleges a ground authorized by Article 1015(4), (5), or (6) and, although eighteen months have elapsed since the date of the child’s adjudication as a child in need of care, no petition has been filed by the district attorney or the department.
C. The district attorney may petition for the termination of parental rights of the parent of the child on any ground authorized by Article 1015.
D.The department may petition for the termination of parental rights of the parent of the child when any of the following apply: (1) The child has been subjected to abuse or neglect after the child is returned to the parent’s care and custody while under department supervision, and termination is authorized by Article 1015(3)(j).
(2) The parent's parental rights to one or more of the child’s siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful, and termination is authorized by Article 1015(3)(k).
(3) The child has been abandoned and termination is authorized by Article 1015(4).
*298 (4) The child has been placed in the custody of the state and termination is authorized by Article 1015(5).
' (5) The child is in foster care because the parent is incarcerated and termination is authorized by Article 1015(6).

. After the 1997 amendment; La. Ch.C. art, 1001 provided that:
The purpose of this Title is fa protect children whose parents are unwilling or unable to provide care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination *299 of all parental rights and responsibilities and for the certification of the child for adoption. In all proceedings, the primary concern is to secure the best interest of the child if - a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a suitable home, and if at all possible, to achieve the child’s adoption. The procedural provisions of this Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for children.

. La. Ch.C, art 1001 was again amended by in 1999 to add the terms “safety and” in the first sentence and "safe and” hi the third sentence. 1.999 La, ACT 449.